## THE DISTRICT OF COLUMBIA.
### THE YOMACHICHI.

NORFOLK & WASHINGTON, D. C., STEAMBOAT CO. et al. v. UNITED STATES et al.

No. 3668.

Circuit Court of Appeals, Fourth Circuit.
Jan. 8, 1935.

Edward R. Baird and George M. Lanning, both of Norfolk, Va. (Baird, White & Lanning, of Norfolk, Va., on the brief), for appellants.

Allan D. Jones, Sp. Asst. to Atty. Gen., for appellees.

Before PARKER and SOPER, Circuit Judges, and MYERS, District Judge.

MYERS, District Judge.

This action arose out of a collision between the steamship District of Columbia and the motorship Yomachichi, which occurred in the main channel leading from Hampton Roads to Chesapeake Bay and the Virginia Capes, about 6:23 o'clock on the morning of November 29, 1932.

The District of Columbia (hereinafter referred to as the District) is a passenger and cargo steamer, owned by plaintiff corporation, regularly operated between Washington and Old Point Comfort and Norfolk, Va., and was then inward bound from Washington.

The Yomachichi is a merchant vessel, owned by the United States and operated by the defendant Roosevelt Steamship Company.

In the course of navigation in the vicinity of the Old Point Comfort dock, where the District was to make a landing in its regular course, Yomachichi, bound outward from Norfolk to New York and India with cargo, struck the superstructure of the District on the port side about 137 feet from the stem. Both vessels were damaged, but not seriously below the water line.

The captioned libel was filed, alleging that the collision and resulting damage were due solely to the negligence, fault, or wrongdoing of the Yomachichi and those in charge of her. Cross-libels were set up by defendants, owners and operators of the Yomachichi, denying fault, and claiming its damages as the result of want of care, skill, and attention to duty on the part of those in charge of the navigation of the District. The causes were consolidated, and, after hearing, libelant's proctors filed a written brief with the District Court, conceding faulty navigation of the District, but insisting that the damages resulted from lack of co-operation on the part of the Yomachichi.

From opinion and decree of the District Court awarding Yomachichi its proper damages, to be ascertained by commissioners to be appointed upon determination of appeal, if affirmed, libelants Norfolk & Washington Steamboat Company, owners of the District, and its master, Posey, appeal on the following assignments of error:

"1. The Court erred in failing to hold the collision in the pleadings and proofs described was occasioned by fault on the part of both S. S. District of Columbia and motorship Yomachichi, and in holding it

was occasioned solely by fault on the part of District of Columbia, in dismissing the libel of Norfolk & Washington D. C. Steamboat Company, and decreeing United States of America, as owner, and Roosevelt Steamship Company, Inc., as operator, of Yomachichi, should recover from District of Columbia the damages occasioned them respectively and costs.

"2. The Court erred in failing to hold:

"(a) Yomachichi's pilot, having knowledge that District of Columbia 'was about to go into its slip was bound * * * to conduct his navigation with reference to such knowledge.'

"(b) Yomachichi was at fault 'in failing to stop and reverse as soon as she noticed' the porting of District of Columbia.

"3. The Court erred in failing to recognize the rule that it is the duty of a navigator 'when * * * in doubt to slow or stop and reverse * * * engines,' etc.

"4. The Court erred in failing to recognize the rule that it is not sufficient 'merely to sound the alarm and slow and stop his engines,' but it is a duty to get the way off his vessel as promptly as possible. A navigator is 'not privileged to continue on his course on the chance that the other vessel would change her announced purpose if he refused to consent.'

"5. The Court erred in not holding Yomachichi's failure to stop and reverse was due to a belief that District of Columbia was at rest when she was under way, making twelve miles an hour.

"6. The Court erred in failing to hold Yomachichi at fault in failing to stop and reverse immediately although it found: 'At the time the vessel's one blast signal was given by the District of Columbia the vessels were in such close proximity that a collision was inevitable if the District of Columbia maintained her speed and course.'

"7. The Court erred in holding the entries in Yomachichi's log did not mean what they said, and in not giving effect to those entries.

"8. The Court erred in failing to find that the cross-signals given by Yomachichi were in violation of the Navigation Rules and constituted fault.

"9. The Court erred in failing to find Yomachichi was at fault because she was proceeding along the middle of the channel instead of keeping to her starboard side of said channel as required by the Narrow Channel Rules.

"10. The Court erred in not holding Yomachichi was at fault for failing to slacken speed or stop until passing signals were agreed on."

While the assignments of error imply failure of the trial court to recognize and apply certain well-established rules of navigation, a careful reading of the exhaustive opinion of the court leads to the conclusion that they were given full consideration in the light of the findings of fact.

"When conflicting evidence has been submitted to a court charged with findings of fact in a case, its conclusions thereon are taken as presumptively correct." Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764.

Judge Simonton, in the case of The Anaces (C. C. A.) 106 F. 742, 744, reviews this and other cases, and states: "We have uniformly held that, while the findings of the court below on questions of fact can be reviewed in this court, * * * the conclusion of the district judge on a conflict of evidence is entitled to, and is treated with, great respect."

And in Coastwise Transp. Co. v. Baltimore Steam Packet Co., 148 F. 837, this court says: "All of the libelant's witnesses were examined in open court, as was also the master of the respondent. The rule is well established * * * that under such circumstances an appellate court will hesitate long before reversing a decree based on questions of fact so found."

In this case all possible information was presented of the events leading up to and culminating in the contact of the vessels, from the standpoint of conflicting views and interests, including statements of all the individuals in any way concerned, and of disinterested observers on another Bay boat then at dock half a mile away. Every witness was examined and cross-examined by experienced and able admiralty practitioners. Where there was a conflict of evidence, or a possibility of lack of veracity involved, the trial judge is presumed to have been guided in his conclusions by those evidences of demeanor so helpful to one of experience in weighing human testimony, as well as by the probabilities supported by knowledge of human experience where honest differences were apparent. His expressed convictions, therefore, entitled to great respect and not to be lightly reversed, must be shown to be contrary to the weight of the evidence, in order to justify a reversal.

The course and position of the vessels shortly before the impact is agreed upon in essential particulars. The District, inward bound, well to the southward of midchannel, was proceeding on a westerly course. Her position in the channel was not in violation of proper rules of navigation. It was her purpose to swing over and across the channel in the customary manner of Bay boats for a flood-tide landing at Old Point Comfort dock. Her speed was about 12 miles. Yomachichi, outward bound, eastwardly, was making about 10 miles per hour. The wind was to the north; visibility good. So proceeding, the two vessels, without material change of course, would have passed starboard to starboard, about three or four hundred yards apart.

The narrow channel rule (Inland Rules, art. 25, 33 USCA § 210) is stated in Hughes' Admiralty, p. 290 (2d Ed.): "If it" (the channel) "is wide enough to permit two steamers to pass at a safe distance without the necessity of exchanging signals, the rule would not apply, and it would be idle to require two steamers to cross to the other side." The suggestion in assignment of error No. 9 that Yomachichi was at fault because she was proceeding along the middle of the channel instead of keeping to her starboard side of said channel is without merit. The course of Yomachichi at this point was properly held to have been without fault, and in no way to have contributed to the results.

The exact point in the channel with relation to the dock at which the course of the District was changed is immaterial. The relative positions of the vessels are important. The trial judge found that, when the vessels were probably not over four or five hundred yards apart, the District started a swing to starboard which, if maintained, would necessarily and quickly carry her across Yomachichi's course. The master of the District stated that at this time the Yomachichi "was way up the river, and showed only a white light"; that he "kept coming," a "little while after" swung about two more points, then "saw a dim green light and saw it was a ship under way"; that he blew one whistle, signifying a starboard course, and made no change in speed. The handling of the Yomachichi from this time to the moment of impact is the crux of all matters for review.

Appellants rely largely upon the admission of Yomachichi's pilot that he recognized the District, when she was more than a mile away, as a Bay boat, probably maneuvering the south side of the channel for her ultimate swing across to the dock. This did not indicate necessity for, but negatived the idea of need for, starboard to starboard passing signals under article 18, rule 1 (33 USCA § 203, rule 1). Yomachichi had a right to assume that the course of each vessel, and consequent more than ample passing distance, would be maintained. Common sense and reason, applied to demonstrated results, are the basis for rules of navigation, as for all other requirements of conduct in given circumstances. Prior to the dangerous maneuver of the District in swinging across the channel and consequently across the bow of the Yomachichi, there was no indication to Yomachichi's pilot and crew that at her speed she would not be out of the way in time for the District's swing to dock under Yomachichi's stern. Admission, therefore, by Yomachichi of knowledge of the ultimate course and purpose of the District did not indicate a situation at that time of danger requiring her to stop and reverse. That Yomachichi's inference of the change in speed of the District at the time of her change of course was contrary to fact did not impute error to Yomachichi in failing to stop and reverse at that time, as suggested in assignment of error No. 5. The trial court found that this maneuver did affect the appearance of approach speed, and Yomachichi's proper inferences of the intention of the District were such as to justify her procedure at that time. In none of the numerous cases cited by appellants where the danger rule was applied is there a finding of fact which would apply to the case at bar. This court can find in the record no reason for reversing the court below in its finding that Yomachichi was justified in the inference that, even when the red light showed on the District in her swing, it was her purpose to cross under Yomachichi's stern—particularly as no signal blast was *then* given—nor its finding that when the one whistle was blown there was still time, in recognition of Yomachichi's responding warning signal that to persist in its after-developed purpose would be dangerous, for the District to slacken speed or reverse its course to an extent which would have resulted in the maneuver anticipated by Yomachichi without danger of contact. The master of the District admits that he failed to understand the warning signal of Yomachichi; thought she might be going to quarantine or blowing for the doctor. The quartermaster of the Bay

boat at the dock half a mile away heard clearly and understood. There is an admission of fault in the effort to cross Yomachichi's bow and depend upon her officers recognizing and avoiding the danger thus created. There is a further evidenced purpose to continue on the changed course regardless of warning. Posey, District's master, says that, had he recognized Yomachichi's danger signal, he could have stopped, backed, and avoided the impact; that it could have been similarly avoided if either had stopped and backed at that time, "because we was a long ways apart." At this time the hull of the Yomachichi had been observed by him. His inference that she was anchored was not supported by the required lights. Nor does the evidence disclose any warrant for his thought that Yomachichi might have been slowed down waiting for the doctor from quarantine, nor for his suggestion of an increase in Yomachichi's speed at this time.

█ The court below found that there were three experienced navigators on Yomachichi's bridge, the master, the Virginia pilot, and one McKinnon, who held a master's certificate of all oceans. What was required of the Yomachichi, so handled, was no more than common sense, prudence, and care in the circumstances. When the necessity for an understanding and agreement by proper signals was made apparent by the unanticipated persistence of the District's effort to cross Yomachichi's bow, there was then no appreciable time within which the requirements of the danger rule to slow and reverse could have been observed to any greater extent or with any different results, as is shown by the record. There is no force, therefore, in appellants' contention that Yomachichi placed on herself the burden of showing that she did not cause or contribute to the accident, having later taken the precaution she should have taken when danger developed. The trouble with the argument is not with the soundness of the proposition advanced as a means of fixing responsibility in a given case. It is merely inapplicable in the face of the finding by the District Court that the dangerous situation did not arise until the District failed to observe Yomachichi's warning and persisted on its perilous course without deviation or slackening of speed. The navigation rules as to passing signals provide a means of arriving at a mutual understanding, and are in no sense intended to provide a prior right for a vessel determining upon a dangerous change

in its course, and signalling to that effect. If such signalling right and change is asserted, this court well recognizes that the other vessel is still held to strict accountability for careful and prudent navigation. The claim of Yomachichi's master and pilot that the District could have avoided the collision by reversing refers plainly to the time her course was changed and the following moments when they were, as was held, justified in assuming that the indicated purpose of crossing Yomachichi's bow would not be persisted in. The claim of these officers that Yomachichi could not avoid the collision by reversing and backing applies with equal force to the time when, her warning signal ignored, prudence and reason and careful navigation left to them, as the only method of avoiding the greater catastrophe of striking the District amidships and cutting her in two with probable loss of life, stop and reverse orders, and a hardastarboard wheel —the necessary orders to throw this righthand propeller vessel to port in such position as to soften the inevitable blow to the District and, as well, to minimize the inevitable consequences of danger to their vessel, the Yomachichi.

█ The District Court held the entries in Yomachichi's log, indicating some three minutes or more of elapsed time from the blowing of the first signal to the moment of impact, as approximate only, that something less than two minutes was the actual time, and that Yomachichi was doing all there could have been done by way of careful seamanship, "unaided"—as the court properly says, in so far as it appears to this court —"unaided by any corresponding efforts on the part of the other vessel involved."

Appellants' citations would present the necessity for involved differentiation, but for this court's conviction of the glaring fault of the District, coupled with Yomachichi's reasonable expectation that the more prudent, careful, and seamanly course then open to the District would be pursued. To apply here the general accountability stated as a definite duty in the case of The Quogue (The Transfer No. 12) (C. C. A.) 47 F.(2d) 873, would be to suggest danger in navigation of any two vessels, alone in sufficiently open waters, as was the case here. In his statement of the narrow channel rule, Mr. Hughes at page 290 (2d Ed.) recognizes that in the circumstances of this case and in the careful pursuance of their designated courses there was no requirement for any exchange of signals. Rather, we think, as

stated by the District Court, this is within the class of cases where, gross fault on the part of one vessel being established, "any doubts regarding the management of the other, or the contribution of her faults, if any, * * * should be resolved in her favor." The Delaware (C. C. A.) 66 F.(2d) 467, 469.

On the view of the District Court favorable to Yomachichi, the decree would have to be sustained, in the absence of clear and convincing proof of fault necessary to a case for apportionment. The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Domira (C. C. A.) 56 F.(2d) 585, citing: The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; Steffens v. United States (C. C. A.) 32 F.(2d) 206; The Livingstone (C. C. A.) 113 F. 879.

The Putney Bridge (D. C.) 219 F. 1014, 1016, is directly in point with the finding of fact in the case at bar. Judge Rose, in his able opinion, says: "There is here presented a case in which one of the vessels has been navigated with what appears to be a great lack of care, skill, and watchfulness, and has acted in direct defiance of the rules of navigation. Even, under such circumstances, if her intention to persist in so doing is made clearly manifest in time for the other ship to avoid the danger thus created, it is the duty of that other so to do. But the burden of showing that the otherwise innocent vessel could have rendered harmless the fault of the guilty rests on the latter. All doubts in such case must be resolved in favor of him who has obeyed the rules. Whether he neglected something he should have done must be determined, not by the result, but by the situation as it presented itself to him at the time. In solving it he is not required at his peril to forecast the future or to display intuitive genius. If he exercised the sound judgment of a competent navigator, he has done all that can be required of him."

Judge Way of the District Court, after an exhaustive review of the evidence, concludes:

"The District of Columbia strongly relies also upon rule 7 of the Pilot Rules, which provides as follows:

" 'When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

" 'If from any cause the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood.'

"As the court views the evidence, it signally fails to present a case such as contemplated by the first paragraph of that rule. Instead, it presents the case of two vessels proceeding on parallel courses, which would have caused them to pass starboard to starboard some distance apart, had not one of them without timely warning suddenly changed its course to such an extent as to carry it directly and quickly across the other's bow. Ordinary prudence and caution made it the duty of the District of Columbia under the circumstances disclosed to cross the stern of the Yomachichi instead of taking the course she did. Furthermore, when that vessel received the danger signal from the Yomachichi, it was its duty to stop, and also to reverse if necessary. Had the District of Columbia crossed the stern of the Yomachichi, or had she stopped and backed upon receiving the danger signal, the collision would have been avoided.

"The suggestion that the Yomachichi should have steered to starboard instead of to port, to avoid a collision, it seems to me is in the very teeth of the evidence. Even if it were conceded that the Yomachichi erred in that maneuver, I would still be strongly inclined to the view that it was an error committed in extremis for which that vessel should not be held so strictly accountable, since the emergency was created by the fault of the other vessel. However, the clear weight of the testimony convinces the court that if the Yomachichi had steered to starboard instead of to port, in all reasonable probability the collision would not have been avoided, but would have been decidedly more serious than it was."

■ We are unable to find, upon most careful inspection and study of the record, any reason under the rule stated for disturbing the announced conclusions of fact by the learned judge below, or any error in the application of the sound requirements of re-

sponsibility in navigation fixed by well-established rules of this and other courts.

This cause is therefore remanded to the District Court of the Eastern District of Virginia for the filing of such necessary orders, and for such further administrative procedure as is necessary to effectuate the decree and judgment hereby affirmed.