The SMOOT SAND AND GRAVEL COR-PORATION, Appellant,

v.

BALTIMORE STEAM PACKET COMPA-NY, a corporation, trading as Old Bay Line, Appellee.

No. 13911.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 21, 1957.

Decided Dec. 5, 1957.

---

Mr. Harry L. Ryan, Jr., Washington, D. C., with whom Mr. Duane G. Derrick, Washington, D. C., was on the brief, for appellant.

Mr. Walter M. King, Jr., Washington, D. C., for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN and BURGER, Circuit Judges.

PER CURIAM.

A southbound steamer destined for Norfolk collided near Mt. Vernon with a northbound tugboat with two scows lashed alongside. The question presented is whether the trial court correctly dismissed the complaint at the close of the tugboat's case on the grounds first, that the negligence of the steamer had not been shown, and second, that it affirmatively appeared that the tugboat's negligence was the sole cause of the collision.

After dark on January 13, 1954, on a clear night, appellant's tug with two scows lashed alongside, each loaded with over 300 tons of sand, was headed upstream (north) on the Potomac, on the Virginia or left (port) side of the main channel. Appellee's steamer, bound from Washington to Norfolk, was proceeding down the river, and was first sighted by the tug when the vessels were from a quarter to a half mile apart. At this point the steamer was on the Maryland (its port) side of the channel.

On sighting the steamer, the tug signalled with two short blasts for a starboard-to-starboard passing, which at that time could easily have been effected. The steamer did not respond. Instead of holding her course on the Maryland side, the steamer turned to her right, and headed across the tugboat's course, toward the Virginia side as if to make a port-to-port passing, that is, as if to pass between the tug and the Virginia shore. Perceiving this, the tug repeated her signal for a starboard-to-starboard passing, but again got no response. The steamer after reaching the Virginia edge of the channel then apparently decided not to make a port-to-port passing but turned back to its left, toward midstream, as if to make the starboard-to-starboard passing originally signalled for by the tugboat. All this time the tugboat never varied its speed or course. When the tugboat captain observed the steamer's final turn, he saw a collision was probable and at once executed the danger signal of four blasts, and went into reverse from a forward speed of four knots. He testified he could not have otherwise maneuvered his tug and scows in tow to avoid the collision under the circumstances, given the wind, speed, cargo and current. In the posture of the case the steamer's version of the events is not before us, but all efforts, whatever they were, to avoid the collision were fruitless, and the steamer struck the port side of the forward scow.

Section 203 of the applicable navigation statutes (33 U.S.C.A.) provides that vessels approaching each other head and head, or nearly so, shall pass port-to-port; i. e., each shall keep to the right as do motor vehicles on the road. It also provides that if the courses of the vessels are so far on the starboard of each other as not to be head and head, either vessel shall immediately give two blasts of her whistle, which the other vessel shall answer promptly by two similar blasts, and they shall pass starboard-to-starboard.[1]

---

1. The testimony here was that when the tug first sighted the steamer they were

on parallel courses at least a passing distance apart. They were not in a

Section 210, which deals with conduct in narrow channels,[2] is a logical corollary of the "keep to the right" rule of section 203. It states that in narrow channels, "every steam vessel shall, *when it is safe and practicable*, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." (Emphasis added.) Section 212 is to the effect that the rules are not inflexible, and special circumstances may justify a departure.

 The trial court found that the tug had violated section 210, and concluded this was negligence under the circumstances. It also concluded that no negligence on the part of the steamer had been shown. It is not clear that the former conclusion is correct, but we think it clear that the latter conclusion is erroneous. According to the record, these two vessels were in a position to pass starboard-to-starboard, and could safely have done so, provided each kept its course. This being so, each was *bound* to hold its course.[3] The tugboat, however, took the added precaution of signalling her intention to do just this, which was the "safe and practicable" thing to do in the circumstances. In the face of this situation the steamer was clearly negligent in turning to her right and attempting to make a port-to-port passing.[4] The steamer's argument in briefs before this court that she was only trying to get over to the right to comply with section 210 is without merit. Section 210 is not an inflexible command, especially where one vessel gives a timely signal for departure from the "narrow channel rule" because it does not consider literal compliance "safe and practicable." Here a mechanical adherence to section 210 combined with disregard of the tugboat's signals may well be said to have produced a collision;[5] since no evidence of the steamer's case has been heard, a final assessment of negligence must of course await trial of all the issues.

 The trial court apparently was also influenced by the matter of the lights carried by the scows. Appellee urged, and the trial court agreed, that the lights were not in accordance with the regulations.[6] Whether there was any causal connection between the absence of some required lights and the collision is not shown on this record. Without causal connection the absence of the lights would not be material.[7]

Reversed and remanded for new trial.

---

"head and head" attitude, because each was showing only a green running light to the other, and not both red and green. This meant that there would be no collision if each kept its course.

2. This section of the Potomac, which is about two miles upstream from Mt. Vernon, is a narrow channel about 250 yards wide where the collision occurred.

3. The Deutschland, D.C., 14 F.Supp. 282, affirmed 2 Cir., 1937, 90 F.2d 454; The Bellhaven, 2 Cir., 1934, 72 F.2d 206; see Matton Oil Tsfr. Corp. v. The Greene, 2 Cir., 1942, 129 F.2d 618.

4. The District of Columbia, 4 Cir., 1935, 74 F.2d 977, 103 A.L.R. 768, certiorari denied Norfolk & Washington, D. C. Steamboat Co. v. U. S., 295 U.S. 745, 55 S.Ct. 657, 79 L.Ed. 1691.

5. There is a duty to disregard the narrow channel rule when it is clear that adherence to it will produce disaster. The Three Brothers, 2 Cir., 1909, 170 F. 48.

6. The tug herself was properly lighted, carrying red, green and white running lights, and two lights on her mast indicating she had vessels in tow. Each of the scows carried a white light, four feet off the water. There was a question whether 33 C.F.R. § 80.16(f) or 33 C.F.R. § 80.16(h) governed the lighting arrangement (the former calling for red and green lights on the lead scow, and the latter calling merely for white lights on each scow, eight feet off the water). But in view of our holding, we do not consider which of the two sections applied.

7. See Lind v. United States, 2 Cir., 1946, 156 F.2d 231. Of course, it would be otherwise if the improper lights deceived the steamer into making the crucial maneuver.